2020 IL App (1st) 181812-U

No. 1-18-1812

Order filed November 20, 2020

Sixth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 17 CR 8865 |
| | ) | |
| MICHAEL MANTLO, | ) | Honorable |
| | ) | Lawrence E. Flood, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CONNORS delivered the judgment of the court.
Justices Harris and Griffin concurred in the judgment.

**ORDER**

¶ 1   *Held*:  We reverse defendant's conviction for unlawful use or possession of a weapon by a felon because the evidence was insufficient to prove beyond a reasonable doubt that he had dominion and control over the gun such that he had constructive possession of it.

¶ 2   Following a jury trial, defendant, Michael Mantlo, was convicted of unlawful use or possession of a weapon by a felon (UUWF) (720 ILCS 5/24-1.1(a) (West 2016)) and sentenced to

four years' imprisonment. On appeal, defendant argues the State failed to prove beyond a reasonable doubt that he constructively possessed a firearm. For the following reasons, we reverse.

¶ 3　　Defendant was charged with unlawful use or possession of a weapon by a felon. At trial, Chicago police officer Carlos De La Torre testified that on May 28, 2017, he was assigned to execute a search warrant at a residence on the 500 block of West 45th Street (45th Street residence). Upon entry into the residence, De La Torre met Tiffany Williams. After speaking with her and relaying information to other officers, a Glock 26 firearm, an extended magazine, and an additional magazine were found in the front bedroom closet inside the hood of a jacket. De La Torre recovered "some articles of clothing from the closet" and Williams provided him with a firearm bill of sale for a Glock with a serial number that matched the serial number on the recovered gun.

¶ 4　　Defendant, whom De La Torre identified in court, arrived at the 45th Street residence approximately 10 minutes after the officers arrived. Defendant was placed into custody and De La Torre spoke with him. Following *Miranda* warnings, defendant told De La Torre "he has" lived at the 45th Street residence for several years and "lives there" with his girlfriend, Williams. Defendant further stated that his and Williams's bedroom was at the front of the residence, and their children's bedroom was at the back. He said there was a gun in "his bedroom," but Williams had a Firearm Owner's Identification (FOID) card.

¶ 5　　After the search, De La Torre and other officers transported defendant to the police station. Before they left the residence, however, defendant asked if they could recover a jacket from his bedroom for him to take to the lockup. Another officer brought defendant a sweater from the bedroom. De La Torre also testified that in his experience, previous search warrants had not led to

drugs or guns being recovered. However, the officers recovered narcotics equipment from the 45th Street residence.

¶ 6    On cross-examination, De La Torre acknowledged that he had given sworn testimony before a judge to obtain the search warrant.  The search warrant for the 45th Street residence was for cocaine, which police did not recover. Defendant was not present when the officers arrived at the residence. The firearm bill of sale showed Williams was the buyer and the date of sale was March 3, 2017. De La Torre acknowledged that defendant was arrested despite the firearm bill of sale and Williams's valid FOID card, which allowed her to legally possess the gun and ammunition in her home. To De La Torre's knowledge, the gun and ammunition were not tested for fingerprints or DNA. Defendant did not sign a statement and De La Torre did not make a video recording of defendant's statement.

¶ 7    On redirect, De La Torre testified that it was customary for the Chicago police department to limit DNA and fingerprint testing to cases involving violent offenses. De La Torre was not equipped with a video camera to record defendant.

¶ 8    On recross, De La Torre acknowledged that he read defendant his *Miranda* rights and, to his knowledge, there was no document for defendant to sign stating he received those rights.

¶ 9    Chicago police officer Angel Colon testified that on May 28, 2017, he was part of the team executing the search warrant at the 45th Street residence. Upon entering the residence, he detained Williams to "make the place safe." Colon spoke with De La Torre and, based on that conversation, searched the closet in one of the bedrooms. There Colon found a black semiautomatic handgun in the hood of a jacket hanging in the closet, along with two semiautomatic gun magazines, which were outside of the gun. Each magazine was loaded with one live round. Colon also found a loaded

semiautomatic magazine containing bullets in the hood of a sweater, two more magazines in the pockets of a black jacket, and two live 9-millimeter rounds in magazines outside the weapon. Colon identified photographs of the locations where he recovered the items, which included the room, closet, hood of the jacket, sweater, and black jacket pocket. He also recognized People's Group Exhibit No. 7 as the clothing items found in the closet, which included: the jacket containing the gun and two magazines in the hood (People's Exhibit No. 7a); the sweatshirt, where a single magazine was recovered from the hood (People's Exhibit No. 7b); and the black jacket, where two magazines were found in the pocket (People's Exhibit No. 7c). A separate officer photographed and recovered the items from the 45th Street residence.

¶ 10　On cross-examination, Colon acknowledged defendant was not present at the 45th Street residence when the officers arrived. He further acknowledged he did not see defendant touch the gun, nor was the gun found on defendant. Asked whether "there were other items in the house that were inventoried *** You inventoried some men's clothing, but there was women's clothing; correct?", Colon responded, "I believe so."

¶ 11　Chicago police officer Mark Mendez testified he was the recovery officer on the team executing the search warrant on the 45th Street residence. As recovery officer, he photographed the residence and place where the search was conducted, recovered the evidentiary items, and took post-photographs after the search was completed. Mendez kept the recovered items in his care, custody, and control until he returned with them to the police department, where he inventoried them pursuant to Chicago Police Department procedures. He recognized People's Group Exhibit No. 7 as the "jackets" recovered from a bedroom closet and testified that the exhibits were "[i]tems of clothing which belonged to a male." Mendez also recognized the items recovered from the

jacket identified in People's Exhibit No. 7a, including a Glock 26 semiautomatic handgun with a 10-round magazine and 30-round magazine, which fit into the gun. Mendez further recognized the two bullets found in those magazines, which were inventoried separately. Mendez identified a 15-round magazine recovered from the sweatshirt identified in People's Exhibit No. 7b, two additional magazines recovered from the jacket identified in People's Exhibit No. 7c, and various ammunition recovered from the magazines.

¶ 12    Mendez identified a U.S. postal box "containing two envelopes and an invoice." He found the box in a bin that was in the same closet as the jackets, gun, and ammunition. The box had defendant's name, "Michael Mantlo," and an address on the 500 block of West 43rd Street (the 43rd Street residence). One envelope inside the box contained a small caliber magazine. The second envelope had a diagram of a firearm slide, firing pin and spring, and contained a broken firing pin. Mendez also testified that the invoice in the closet had defendant's name on it. Finally, Mendez identified the photographs he took of the 45th Street residence and the items he recovered.

¶ 13    On cross-examination, Mendez testified he did not personally find any of the inventoried items. Mendez did not provide any further details about the invoice other than it reflected the date of sale to be September 6, 2016. Mendez recalled seeing women's and children's clothing in the 45th Street residence. He did not find weapons in the women's or children's clothing.

¶ 14    The State introduced into evidence a certified copy of conviction for "manufacture/delivery" in case number 08 CR 04212.

¶ 15 For the defense, defendant's father, Michael Mantlo, testified he had the same name as defendant.[1] Around 8:30 p.m. on the day of the search, he was in his garage at the 43rd Street residence with defendant. Defendant lived at the 43rd Street residence with his father and grandmother. While in the garage, defendant's father received a phone call from his wife, who lived on 45th Street. She stated police were "knocking down my [grand]son's mother's door" at the 45th Street residence. Defendant's father relayed that information to defendant, and defendant left. Defendant's father acknowledged that he was a convicted felon and had a prior conviction for misuse of a credit card for which he served a five-year sentence.

¶ 16 On cross-examination, defendant's father testified that defendant had lived with him for "about a year" at the time of trial in 2018. Prior to that, defendant had lived at the 45th Street residence in the basement. When asked how long defendant and Williams had been broken up, defendant's father answered "[a]bout the same amount of time, about a year." He then specified that defendant and Williams had been broken up before the search took place. Defendant's father acknowledged that defendant went to the 45th Street residence to "see what was going on." He further acknowledged purchasing a firing pin in 2016, which he still possessed. Defendant's father did not "think" the firing pin was at Williams' residence on the day in question.

¶ 17 On redirect, defendant's father testified that Williams lived at the 45th Street residence with her son, who was about eight years old.

¶ 18 Tiffany Williams testified she lived at the 45th Street residence with her and defendant's seven-year-old son, and was living there in May 2017. Williams and defendant broke up in early

---

[1] We refer to this witness as "defendant's father" because defendant and his father are both named Michael Mantlo.

February 2017 and at that time, defendant moved out of the 45th Street residence. Defendant did not take all of his clothing with him. He left behind "some shirts sweatshirts" that Williams sometimes wore. Williams knew that defendant's father had a "dresser full of junk mail" in the 45th Street residence. She also knew defendant lived with his grandmother on 43rd Street in May 2017.

¶ 19    Williams acknowledged there was a digital scale in her house, but denied that it belonged to her. The scale was from defendant's previous job as a laboratory technician. She denied that anyone was selling drugs out of her home. Williams was a gun owner and had a valid FOID card. She identified the bill of sale for the nine-millimeter Glock firearm that she legally purchased on March 3, 2017, from Joey Brennan, a man from her neighborhood. The Illinois State Police approved the gun sale, and the approval number was listed on the bill of sale. The gun came with "a box full [of] magazines, bullets." Williams purchased the gun for her safety after defendant moved out. She initially had it in a "Glock box," but removed it from the box two days before the police searched her house because "a guy down the street" had been threatening her. Instead of returning it to the box, Williams placed the gun in the hood of a hoodie that defendant left behind, which she considered her own at that point.

¶ 20    Williams was home alone at 8:30 p.m. on the night the police searched the 45th Street residence. Defendant was not present. Williams heard "boom, boom, boom," and as she was about to open the door, the police "came through." The police had their guns drawn on her, told her to get down on the floor, and asked about defendant's whereabouts. Williams informed the police that defendant was at his grandmother's. The police also asked where "[t]he drugs" were and she responded there were no drugs in the residence. The police did not ask about guns, but Williams

informed them that she had one and told the officers where the gun and ammunition were located. She also showed the police her FOID card and the bill of sale for the firearm. Williams did not tell the officers that defendant lived at the 45th Street residence. After Williams showed police where the gun was located, they continued to search her residence. The police did not give her the opportunity to provide a written or videotaped statement.

¶ 21     On cross-examination, Williams testified that she and defendant had been in a relationship for about 10 years. The gun she purchased in March 2017 cost $400. She paid in cash and bought four magazines. The gun came with a box and gun lock. Williams denied that defendant was allowed in and out of her house at that point. However, defendant came over the day of the search. Defendant did not walk in her residence; rather, the police approached him first outside. Asked how often she saw defendant, Williams responded, "When he has to come and get his son," which was on Wednesdays and every other weekend.

¶ 22     The gun was loaded on the day of the search, but it was not always loaded. Williams identified the gun, two magazines, a 10-round nine-millimeter magazine, and a high capacity magazine. All of the magazines came with the gun when Williams purchased it. Williams also identified another 10-round nine-millimeter magazine, two additional magazines, and some bullets. She had fired the gun before and learned how to shoot it. There were "[a]bout 20" bullets in her home at the time of the search.

¶ 23     Williams testified that there were "some jackets" that she wore, which had belonged to defendant. She identified People's Exhibit No. 7a as the "hoodie" where she "thought" she stored the gun and "[m]aybe a magazine" in the hood; People's Exhibit No. 7b as a hoodie where she

stored "[m]aybe" two magazines with bullets; and People's Exhibit No. 7c as the jacket where she stored bullets.

¶ 24    Williams acknowledged the scale had been in her home, but stated it was on the back porch in a dresser with "all the junk." She identified the scale in court. Williams denied that the gun was ever broken, stating she "fired it before." When asked the last time she fired the gun, she responded, "Maybe at the end of January." Williams recognized the postal box, which she testified had been located on her back porch. She was not sure what the box contained. Asked to identify a gun magazine, she stated she had never seen it before and "it was on the back porch *** in the dresser." Williams acknowledged that the magazines she previously identified came with the gun but were not included on the bill of sale. She further acknowledged she did not want defendant to get in trouble. Defendant lived about six blocks from her.

¶ 25    On redirect, Williams clarified she did not want defendant to get in trouble due to a gun she owned. Williams owned the gun and the purchase of the gun included magazines and bullets. The postal box was in defendant's father's dresser.

¶ 26    In rebuttal, Officer Mendez testified that a digital scale in a shoebox was recovered from the bedroom where the jackets were recovered. He inventoried it and photographed where it was found. In court, Mendez identified the scale and a photograph of the scale inside the shoebox where it was recovered.

¶ 27    Following arguments, the jury found defendant guilty of unlawful possession of a weapon by a felon for possessing a firearm (720 ILCS 5/24-1.1(a) (West 2016)). The court denied defendant's motion for new trial and sentenced him to four years' imprisonment.

¶ 28    On appeal, defendant contends the evidence was insufficient to sustain his UUWF conviction because the State failed to show he knowingly possessed a firearm.

¶ 29    On a challenge to the sufficiency of the evidence, we inquire " 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis omitted.) *People v. Davison,* 233 Ill. 2d 30, 43 (2009) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). In so doing, we draw all reasonable inferences in favor of the State (*id*.), and we do not retry the defendant (*People v. Collins*, 106 Ill. 2d 237, 261 (1985)). We must "carefully examine the evidence while giving due consideration to the fact that the court and jury saw and heard the witnesses." *People v. Smith*, 185 Ill. 2d 532, 541 (1999). "But merely because the trier of fact accepted certain testimony or made certain inferences based on the evidence does not guarantee the reasonableness of its decision." *People v. Ross*, 229 Ill. 2d 255, 272 (2008). If, after our careful examination of the evidence, "we are of the opinion that the evidence is insufficient to establish the defendant's guilt beyond a reasonable doubt, we must reverse the conviction." *Smith*, 185 Ill. 2d at 541. The State must prove each element of an offense beyond a reasonable doubt. *People v. Siguenza-Brito*, 235 Ill. 2d 213, 224 (2009). "[W]e will reverse a conviction where the evidence is so unreasonable, improbable, or unsatisfactory as to justify a reasonable doubt of defendant's guilt." *Smith*, 185 Ill. 2d at 541.

¶ 30    In this case, to sustain a conviction for UUWF, the State was required to prove that defendant knowingly possessed a firearm and that he had previously been convicted of a felony. 720 ILCS 5/24-1.1(a) (West 2016); *People v. Gonzalez*, 151 Ill. 2d 79, 87 (1992)).

¶ 31    Defendant does not dispute that he has previously been convicted of a felony. Rather, he contends that the State failed to prove beyond a reasonable doubt that he had constructive possession of the firearm. We agree with defendant.

¶ 32    Where, as here, the defendant was not found in actual possession of the firearm, the State must prove the defendant constructively possessed the firearm. *People v. Sams*, 2013 IL App (1st) 121431, ¶ 10. Constructive possession is often proved with circumstantial evidence. *People v. Love*, 404 Ill. App. 3d 784, 788 (2010). Circumstantial evidence does not require each link in the chain of circumstances be proven beyond a reasonable doubt; rather, it is sufficient if all the evidence, taken together, satisfies the trier of fact beyond a reasonable doubt that a defendant is guilty. *People v. Hall*, 194 Ill. 2d 305, 330 (2000).

¶ 33    To prove constructive possession, the State must establish that the defendant had 1) knowledge of the presence of the contraband and 2) immediate and exclusive control over the area where the contraband was found. *People v. Spencer*, 2012 IL App (1st) 102094, ¶ 17. Knowledge may be inferred from surrounding circumstances, including the defendant's actions, declarations, or other conduct, which indicate that the defendant knew of the contraband's presence in the place it was found. *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002); *People v. Smith*, 288 Ill. App. 3d 820, 824 (1997). Control is shown by proving the defendant had the " 'intent and capability to maintain control and dominion' " over the contraband, even if he lacks personal present dominion over it. *Spencer*, 2012 IL App (1st) 102094, ¶ 17 (quoting *People v. Frieberg*, 147 Ill. 2d 326, 361 (1992)).

¶ 34    "Generally, habitation of the location where contraband is found is sufficient evidence of control constituting constructive possession." *People v. Terrell,* 2017 IL App (1st) 142726, ¶ 19.

"Evidence of residency or habitation often takes the form of rent receipts, utility bills, or mail." *People v. Fernandez*, 2016 IL App (1st) 141667, ¶ 18.

¶ 35    Applying the above principles here, the State did not prove defendant guilty of UUWF beyond a reasonable doubt. Even when viewed in the light most favorable to the State, the evidence was insufficient to prove that defendant had control and dominion over the gun.

¶ 36    There are no physical documents in the record connecting defendant to the 45th Street address during the relevant time period. The State did not present any documents, such as mail, utility bills, rental documents, or a driver's license, showing that defendant rented or lived at the 45th Street residence at the time the gun was recovered. Although the officers recovered a U.S. postal box with defendant's name on it from the room where the gun was recovered, the 43rd Street address was listed on the box, and the State did not present evidence of any documents found inside that box that showed that defendant's address was the 45th Street residence.[2] The postal box was insufficient to establish habitation. See *Fernandez*, 2016 IL App (1st) 141667, ¶ 19 (concluding that the evidence was insufficient to establish habitation where there was no evidence of rent receipts, utility bills, or mail that linked the defendant to the subject residence).

¶ 37    Further, defendant was not present when the officers executed the search warrant at the 45th Street residence. Defendant also presented two witnesses who testified that defendant lived at the 43rd Street residence, not the 45th Street residence. There was no evidence presented showing that defendant had keys to the 45th Street residence or that his name was listed on the doorbell or mailbox of that residence. In addition, Williams testified she owned the gun and there

---

[2] Defendant asserts that the police inventoried 21 pieces of mail recovered from the 45th Street residence that was addressed to "Michael Mantlo." The report of proceedings does not indicate that the mail was presented to the jury or admitted into evidence.

was no evidence presented that defendant ever admitted to the officers that he owned the gun. Accordingly, given the lack of evidence connecting defendant to the 45th Street address, the evidence was insufficient to establish that defendant exercised immediate and exclusive control over the area where the gun was found.

¶ 38 We acknowledge that Officer De La Torre testified that defendant told him during the execution of the search warrant that "he has lived" at the 45th Street residence for several years, that he "lives there" with Williams, that there was a gun in "his bedroom," and that defendant had asked De La Torre if he could get a jacket from "his bedroom." However, we cannot find that these assertions are sufficient to establish beyond a reasonable doubt that defendant was currently residing at the 45th Street residence where there was no other evidence showing that he currently lived there and evidence suggesting that he had previously lived there. See *People v. Pugh*, 36 Ill. 2d 435, 437-38 (1967) (where the officer testified that the defendant told him during the execution of the search warrant that he had lived at the subject apartment for two months and the defendant testified at trial that he had only been in the apartment for six hours before he was arrested, the court found the evidence was insufficient to show constructive possession, noting that there was no evidence that the defendant was renting the apartment and the State "could have produced some evidence that the defendant paid the rent or that he was in the apartment frequently"). Defendant's assertions were not sufficient to establish beyond a reasonable doubt that he resided at the 45th Street residence, and by extension were not sufficient to establish that he had dominion and control over the gun found in that residence.

¶ 39 The State argues that even if the fact finder did not find that defendant lived at the 45th Street residence, it was undisputed that defendant had the ability to control the residence. To

support the State's argument, it asserts that Williams "clearly stated" that defendant had permission to enter the 45th Street residence at the time the search warrant was executed and that he had "explicit permission to enter the residence for the purpose of 'get[ing] his son.' " However, the record does not support these assertions. There was no evidence of defendant having entered the residence on his own. Williams testified that during the execution of the search warrant, defendant was approached by the police outside the residence. Further, with respect to the State's assertion that defendant had "explicit permission to enter the residence" to get his son, Williams testified that she would see defendant "when he has to come and get his son," which was on Wednesdays and every other weekend. The evidence does not show that Williams "clearly stated" that defendant had explicit permission to enter the residence on those days. Rather, asked whether defendant "was allowed in and out of your house; isn't that true?" Williams responded "At the [*sic*] point, no."  Thus, the record does not support the State's assertion that it is undisputed that defendant had the ability to exercise control over the residence.

¶ 40    In sum, the evidence did not establish that defendant had immediate and exclusive control over the residence in which the gun was found. Thus, the State did not prove that defendant constructively possessed the gun and therefore failed to prove defendant guilty of UUWF.

¶ 41    For the foregoing reasons, we reverse the judgment of the circuit court of Cook County.

¶ 42    Reversed.